**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHAIM WINTERNITZ                              :
Divrei Chaim 25                               :
Jerusalem, Israel                             :
                                              :
and                                           :
                                              :
A.W.                                          :
By and through his Parent and Guardian        :
Chaim Winternitz                              :
Divrei Chaim 25                               :
Jerusalem, Israel                             :
                                              :
and                                           :
                                              :
B.W.                                          :     Civil Action No. _____
By and through her Parent and Guardian        :
Chaim Winternitz                              :
Divrei Chaim 25                               :
Jerusalem, Israel                             :
                                              :
and                                           :
                                              :
D.W.                                          :
By and through her Parent and Guardian        :
Chaim Winternitz                              :
Divrei Chaim 25                               :
Jerusalem, Israel                             :
                                              :
and                                           :
                                              :
M.W.                                          :
By and through her Parent and Guardian        :
Chaim Winternitz                              :
Divrei Chaim 25                               :
Jerusalem, Israel                             :
                                              :
and                                           :
                                              :
M.W.                                          :
By and through his Parent and Guardian        :
Chaim Winternitz                              :
Divrei Chaim 25                               :

1

Jerusalem, Israel                                    :
                                                     :
and                                                  :
                                                     :
ESTER WINTERNITZ                                     :
Lange Kievit Street 48                               :
Antwerpen, Belgium                                   :
                                                     :
and                                                  :
                                                     :
FAIGE WINTERNITZ                                     :
12 Hazait                                            :
Jerusalem, Israel                                    :
                                                     :
and                                                  :
                                                     :
JACOB WINTERNITZ                                     :
Plantin & Moretislei Street 74                       :
Antwerpen, Belgium                                   :
                                                     :
and                                                  :
                                                     :
MOSHE WINTERNITZ                                     :
Torat Chaim 3                                        :
Bnei Brak, Israel                                    :
                                                     :
and                                                  :
                                                     :
YITEL WINTERNITZ                                     :
Lange Leem Street 289                                :
Antwerpen, Belgium                                   :
                                                     :
                  Plaintiffs                         :
                                                     :
         v.                                          :
                                                     :
SYRIAN ARAB REPUBLIC                                 :
Damascus, SYRIA                                      :
                                                     :
                                                     :
                                                     :
                                                     :
               Defendant.                            :

## **COMPLAINT**

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*. (hereinafter "FSIA").  This action arises out of the personal injury of Chaim Winternitz during the coordinated suicide bombing terrorist attacks committed at the Brussels Airport in Brussels, Belgium on March 22, 2016.  These bombings were carried out by a Foreign Terrorist Organization ("FTO"), THE ISLAMIC STATE (a.k.a. "ISIS," "ISIL," or "IS") so designated by the U.S. Department of State on December 17, 2004.  ISIS operated with THE material support and resources provided by the SYRIAN ARAB REPUBLIC ("SYRIA" or "Syria") as a designated State Sponsor of Terrorism, having been so designated by the U.S. Department of State in 1979 and having remained so designated at all times referenced herein. The terrorists committed, and Chaim Winternitz was the victim of, acts of "torture" and "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and "personal injury" as required by 28 U.S.C. § 1605A, thereby entitling the Plaintiffs, and each of them, as American victims of Syrian terrorism to bring this action and recover damages pursuant to applicable law.

Plaintiffs state in support of their Complaint and allege the following:

## THE PARTIES

### A.  The Plaintiffs

1.  This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff and on behalf of all those legally entitled to assert a claim under the FSIA, and state common law and statutory law.

### The Winternitz Family

2.  Plaintiff Chaim Winternitz ("Mr. Winternitz") was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen. Chaim Winternitz was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Plaintiff Chaim Winternitz can sue and be sued in this Court.

3.  Plaintiff Jacob Winternitz was, at all times relevant hereto, the biological father of Chaim Winternitz, and a United States citizen. Plaintiff Jacob Winternitz can sue and be sued in this Court.

4.  Plaintiff Moshe Winternitz was, at all times relevant hereto, the biological brother of Chaim Winternitz, and a United States citizen. Plaintiff Moshe Winternitz can sue and be sued in this Court.

5.  Plaintiff Ester Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Ester Winternitz can sue and be sued in this Court.

6.  Plaintiff Faige Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Faige Winternitz can sue and be sued in this Court.

7.  Plaintiff Yitel Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Yitel Winternitz can sue and be sued in this Court.

8.  Plaintiff B.W., a minor born December XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff B.W. can sue and be sued in this Court.

9.   Plaintiff D.W., a minor born December XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff D.W. can sue and be sued in this Court.

10. Plaintiff M.W., a minor born July XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff M.W. can sue and be sued in this Court.

11. Plaintiff A.W., a minor born April XX, 20XX, was, at all times relevant hereto, the biological son of Chaim Winternitz, and a United States citizen. Plaintiff A.W. can sue and be sued in this Court.

12. Plaintiff M.W., a minor born January XX, 20XX, was, at all times relevant hereto, the biological son of Chaim Winternitz, and a United States citizen. Plaintiff M.W. can sue and be sued in this Court.

## B.  The Defendant

13. Defendant SYRIAN ARAB REPUBLIC is a foreign state that was designated in 1979 as a State Sponsor of Terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since. SYRIA has been included on the U.S. State Department's list of State Sponsors of Terrorism longer than any other state.

14. On December 17, 2004, the United States State Department designated ISLAMIC STATE (a.k.a. "ISIS," "ISIL," or "IS") as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act.

15. Defendant SYRIA, at all times pertinent to this action, provided material support and resources to THE ISLAMIC STATE, enabling them to carry out a murderous campaign of terrorism in different countries across various continents, including in Belgium. SYRIA is and has been a State sponsor of ISIS within the meaning of 28 U.S.C § 1605A and the Flatow Amendment, by providing them with funding, equipment, arms, direction, logistical support, and/or training for their terrorist activities. In 2001, the United States government placed further sanctions on the Syrian Arab Republic and various leaders of the Syrian government.

16. President Bashar Al-Assad presently rules Syria as a dictator, and has done so continuously since 2000.

17. President Bashar Al-Assad performed acts within the scope of his office which provided material support and sponsorship to ISIS, and caused the personal injuries resulting from the acts of terrorism described herein. Accordingly, as provided in 28 USC § 1605A(c), Defendant SYRIA has direct liability for its own acts, and vicariously the liability for the acts of President Bashar Al-Assad.

18. Defendant SYRIAN ARAB REPUBLIC is jointly and severally liable to Plaintiffs for their damages resulting from the acts of despicable and heinous terrorism described herein.

## **JURISDICTION AND VENUE**

19. Jurisdiction over the subject matter of this case arises under 28. U.S.C §§ 1330(a), 1331, 1332(a)(2) and 1605A.

20. SYRIA is subject to suit in the courts of the United States as a sponsor of terrorism and for providing material support to and as participants in ISIS' activities pursuant to the FSIA and related statutes.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

22. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, for wrongful death, personal injury, and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

## THE MARCH 22, 2016 ATTACK ON THE BRUSSELS AIRPORT AND METRO

23. Early in the morning on March 22, 2016, Ibrahim el Bakraoui, Nadim Laachraoui, and Mohamed Abrini walked together through the Brussels Airport in Zaventem, Brussels, Belgium ("Brussels Airport" or "Airport") disguised as would-be travelers. All three of them were carrying deadly bombs.

24. Shortly before 8:00 am local time, the three bombers separated to different places within the main terminal. At 7:58am, the first bomber detonated his bomb.

25. Prior to the first bomb being detonated, Mr. Winternitz and his brother-in-law, Mr. Farkash, were at the check-in area of the main terminal of the Airport waiting to board their flight to Israel.

26. They were in Brussels for Mr. Farkash's brother, Aharon's, wedding, with 13 relatives and close family friends, including Mr. Winternitz's wife, Esther, and daughter, BW, as well as Mr. Farkash's sister.

27. Just before the attack started, Esther went back to the counter to receive her value added tax (VAT) refund. Mr. Winternitz impulsively asked Esther to take BW with her, which she did.

28. Hearing the bomb, Mr. Winternitz turned to Mr. Farkash and asked in Yiddish, "Mendy (Mr. Farkash) was that a bomb?"

29. They immediately ran towards the main entrance; Mr. Winternitz pushing his suitcase cart.

30. Esther and BW were still at the counter claiming the VAT and were not in the immediate vicinity of the bombs.

31. As everyone scrambled away from the first explosion, a second bomb went off near the main Airport entrance 37 seconds after the initial explosion.

32. The second bomb threw Mr. Winternitz several feet into the air.  The bomb caused burns on most of his body, shattered his right leg and lodged fragments of shrapnel in his legs, abdomen and head.  His left eardrum was pierced. He suffered severe, permanent and painful injuries.

33. Mr. Winternitz was barely able to walk when a stranger came over to him to an emergency room located within the airport.

34. Mr. Winternitz spent three hours in the emergency area without being able to contact his family.  During this time, his wife Esther and daughter BW could not locate him and feared he was dead.

35. Eventually, Mr. Winternitz was able to contact his mother from the airport emergency area.  She then communicated to Esther that Chaim was indeed alive, but it took another six hours for them to be re-united.

36. From the airport emergency area, Mr. Winternitz was transported by ambulance to the local Erasme Hospital.  Upon arrival, x-rays were taken, and may of his wounds were stitched closed.  The medical personnel at Esrame Hospital told him that his leg might need to be amputated because of the severity of the injury.

37. Later that evening Mr. Winternitz was transferred from Esrame Hospital to AZ Monica Hospital in Antwerp, Belgium.  At AZ Monica Hospital, Mr. Winternitz underwent surgery on his right leg and he was admitted to the ICU.

38. Mr. Winternitz remained in AZ Monica Hospital for ten days.  During this time, each day he was transferred to ZNA Stuivenberg Hospital for therapy on his eardrum.

39. Eventually, on March 31, 2016 Mr. Winternitz was able to be transferred back to Israel by private air ambulance so that he could be admitted to Hadassah University Medical Center in Jerusalem, Israel for the remainder of his recovery and rehabilitation. The private medical transportation was paid for and arranged by family and friends.

40. Once admitted to Hadassah University Medical Center, Mr. Winternitz underwent additional surgeries.  These included surgeries on his leg and additional procedures to remove shrapnel from his back and head.

41. While at Hadassah Hospital Mr. Winternitz underwent daily physical therapy.

42. Mr. Winternitz remained continuously hospitalized at Hadassah Hospital until April 22, 2016, one month after the attack.

43. The attack caused Mr. Winternitz to permanently lose all hearing in his left ear.

44. Mr. Winternitz suffered significant injuries to his legs.  It was not until eight months after the attack that Mr. Winternitz was finally able to walk again, however, Mr. Winternitz still needs crutches to walk.

45. After the Brussels Airport bombings, another explosive was detonated on the Brussels metro during rush-hour traffic. ("Metro Attack" ).

46. Khaled el-Bakraoui detonated his bomb on the Metro just over an hour after the second Airport bomb, killing himself and many of the other passengers in his metro car.

47. This fourth explosion brought the total number of deaths to thirty-two (32) and injuries up to three-hundred and forty (340).

48. Immediately following the Brussels Airport and Metro Attack, ISIS claimed responsibility for the terrorist bombings through a news agency affiliated with the Islamic State, the Amaq Agency.

49. The Brussels Airport and Metro Attacks were each organized, committed and coordinated by ISIS.

50. ISIS helped provide training, weapons, explosives, and other assistance in order to maximize the murderous capabilities of the terrorist attackers.

51. Brussels was susceptible to attack due to the large number of native Belgians who have traveled to Syria to join ISIS and have been able to return to Belgium because of their Belgian passports.

52. Brussels is also a largely symbolic target as it is home to the European Union and NATO headquarters.

53. The terrorists targeted international flight counters, murdering approximately thirty-two (32) people from fourteen (14) different countries including Belgium, Britain,

China, France, Germany, Hungary, India, Israel, Italy, Morocco Netherlands, Peru, Poland, Sweden, and the United States.

54. The terrorists attacked passengers as young as 20 and as old as 79, indiscriminately killing and maiming the elderly, women, and children. Videos show primary school aged children fleeing from the Airport after the explosions.

55. The Brussels Airport attack was carried out by suicide bombers, Ibrahim el Bakraoui, Khaled el-Bakraoui, and Nadim Laachraoui, all three of whom were born in Belgium.

56. A fourth would-be-bomber, fellow Belgian Mohamed Abrini, fled the Airport after the first two bombs went off but before his explosive detonated. Abrini was later apprehended and interrogated.

57. All four men are of Moroccan descent.

58. Each and all of the terrorists acted on behalf of the ISLAMIC STATE, with the support and aid of the SYRIAN ARAB REPUBLIC.

## THE MEMBERS OF THE BELGIAN CELL ARE ISIS AGENTS

59. The four perpetrators of the attacks all had connections to Syria. Each of the terrorists as members of the Brussels ISIS cell visited Syria, had received training and support in Syria and were recruited for their eventual operation by ISIS operatives in Raqqa, Syria.

60. In June 2015, Bakraoui was arrested in Turkey while attempting to enter Syria and deported back to Europe. Laachraoui traveled to Syria in February 2013.

61. For his part, Abrini moved to Raqqa, Syria in 2015, to visit the grave of his deceased brother Soulaymane.

62. This Belgian Cell (as well as the 2015 terrorists who were part of the Paris ISIS cell which committed the terror attack in Paris, France) is believed to have been run by Abdelhamid Abaaoud, known by his ISIS *nom de guerre* Abu Aomar al Beljiki.

63. According to Abrini, Abaaoud, a Belgian national, was an ISIS "emir," who commanded 1000 men in Raqqa, including many Belgians and Frenchmen.

64. Abaaoud reportedly headed a unit focusing on repatriating European-origin jihadis in Syria back to their countries of origin to perpetrate terrorist attacks.

65. In July 2015, a Belgian court sentenced Abaaoud in absentia (as he was believed to then be in Raqqa, Syria) to 20 years in prison, for his role as a principal recruiter of European jihadis for ISIS.

66. Abaaoud recruited Abrini during his 2015 trip to Raqqa, and later dispatched him from Syria to England to pick up $3800 to deliver to Abaaoud's brother, another ISIS operative.

67. Abaaoud was eventually killed by French police during a nationwide manhunt. Before his death, according to former French C/T official Jean Charles Brisard, Abaaoud boasted that he had brought "90 jihadis to Europe" from Syria.

68. Abaaoud was believed to have served as a direct link between Raqqa-based ISIS leadership and terror cells in Europe.

69. Another key Raqqa-based point of command and control was Osama Attar, known as Abu Ahmed.

70. Attar, a Belgian national, initially traveled to Iraq in 2002 to fight against the United States.

71. He was later arrested, and imprisoned in Camp Bucca, where he is thought to have meet Abu Bakr al-Baghdadi.

72. The Bakraoui brothers, who perpetrated suicide attacks in the Brussels Airport and on the Brussels Metro in Molenbeek, were Attar's cousins.

73. In Raqqa, Syria, Attar was responsible for the preparation of terror cells, including military training, providing them with false passports, communication devises, contacts with facilitators and smugglers as well as money.

74. From Syria, in the planning stages of the Brussels attacks, Attar exchanged encrypted messages with Laachraoui, providing operational instruction and guidance.

75. When the safe house of Laachraoui's cell was raided and the group lost the ammunition for assault rifles, for example, Attar advised him to use explosives instead of guns.

76. Attar also received [and caused to publicly published] the last wills of the Brussels bombers.

77. The contacts between the Brussels cell and Attar were confirmed by information discovered on Bakraoui's computer, which was retrieved from a garbage bin near the safe house from which the Brussels Airport attack was launched. Bakraoui and Laachraoui briefed Attar for the last time the day prior to the attacks.

78. Police recovered 15kg of TATP high explosive, chemicals, detonators, bomb-making materials, and an ISIS flag at the apartment where a taxi driver picked up Bakraoui, Laachraoui, and Abrini.

79. The same explosive materials and chemicals were used by the ISIS cell that had committed the terrorist attack in Paris a few months earlier.

80. The Brussels Airport and Metro Attacks were designed to send a message of fear, terrorist threat, coordination and power; and are one of many terrorist attacks that ISIS, operating from within Syria and elsewhere, has directly supported, carried out, or inspired.

81. January 2015, Amedy Coulibaly and three other terrorists had attacked the headquarters of a satirical French newspaper *Charlie Hebdo*. During the attack, Coulibaly called CNN and reported that he belonged to the Islamic State, which subsequently claimed responsibility for the attack.  Police later found ISIS flags in Coulibaly's apartment.

82. The Islamic State is determined to use terror attacks against Americans and other freedom loving people.   Some additional ISIS attacks are enumerated below, as they demonstrate the pattern of heinous terror committed by ISIS.

83. On January 27th, 2015, gunmen in Tripoli, Libya, attacked a hotel, killing nine people including one American. he attack was claimed by ISIS, operating from Syria and elsewhere, and included a car bomb and grenades. Two days later, ISIS jihadists bombed Egyptian security forces, killing fifty (50) people. Of the fifty (50), fourteen (14) were civilians.

84. On November 13, 2015, ISIS organized and coordinated multiple attacks in Paris, killing one-hundred and thirty (130) people and wounding hundreds more.

85. The Paris attacks consisted of three teams including suicide bombers and men armed with assault rifles.

86. A suicide bomber also attacked the Stade de France in Paris during an international soccer game between France and Germany where then-President of France Francois Hollande was in attendance.

87. Around the same time, gunmen attacked on the street Rue Alibert and at a restaurant and bar. Meanwhile, in the center of Paris other shootings were beginning.

88. The deadliest attack occurred at Bataclan Hall, Paris, France a concert venue where eighty-nine (89) people died and at least ninety-nine (99) others were taken to the hospital in critical condition.

89. The Islamic State is believed to have committed each of these attacks and has been overtly and covertly supported and aided by the Syrian Arab Republic in numerous ways, contributing to the deaths and maiming caused by ISIS, operating from Syria and elsewhere.

90. Defendant's sponsorship of, and provision of material support and resources to, ISIS must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of Syria's long, storied and sordid history of employing terrorism as a tool for advancing its domestic and international agendas.

## SYRIA'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO ISLAMIC STATE

91. The Syrian Arab Republic is a republic in name only. In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.

92. Until a February 2012 referendum, its constitution vested one particular party – the Arab Socialist Ba'ath Party –with leadership functions in the State and society.

93. Despite the constitutional referendum, the President still has the power to issue laws, and since 1963, an Emergency Law has been in force that suspends most constitutional protections for Syrians. The President controls the legislative process, emboldened with dictatorial powers.

94. In 1966, Syrian Ba'athists conducted a coup d'état. The Ba'athists eliminated all political parties in opposition.

95. Hafez Al-Assad, the now deceased father of the current President of the Syrian Arab Republic, was appointed Minister of Defense in approximately 1966. Hafez Al-Assad led another coup in 1970, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez Al-Assad was installed as President of the police state.

96. The Al-Assad family has controlled the Syrian regime without interruption for forty years, since 1971.

97. Hafez Al-Assad had a three-decade Presidency, lasting from 1971 to 2000, in which he was confirmed President in unopposed referenda five consecutive times.

98. He was succeeded by his son Bashar Al-Assad in 2000. Bashar Al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.

99. He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

100.     In 2014, Bashar Al-Assad was reelected to a third 7-year term, claiming 88.7% of the vote with polling only allowed in government-held territory.

101.     Members of President Al-Assad's own minority sect, the Al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services.

102.     The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services, the latter consuming a large share of Syria's economic resources.

103.     The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

104.     There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered. These security services answer directly to President Bashar Al-Assad and his brother General Maher Al-Assad, commander of the Syrian Republican Guard.

105.     Syria is a dictatorship. It is clear that support for ISIS from Syrian territory and/or Syrian government actors, on the scale required to facilitate ISIS, could not have been accomplished without the explicit authorization of the Syrian government and Syrian Military Intelligence through President Al-Assad. Syria's own Foreign Minister once publicly admitted, with reference to terrorist attacks carried out by the Abu Nidal Organization with Syrian material support and sponsorship, "Whoever knows my government must realize that such attacks could not be carried out without its awareness."

106.     A U.S. Department of State Bulletin published in 1987 states: "Available evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself. Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and Western targets. The Bulletin lists many examples of Syrian sponsorship of terrorism and terrorist organizations. A sampling of these include the following terror attacks:

i.   The suicide truck bombing of U.S. Marine barracks in Beirut, Lebanon, on October 23, 1983, in which 299 American and French servicemen were killed, an operation attributed by then U.S. Secretary of Defense Caspar Weinberger to "basically Iranians with sponsorship and knowledge and authority of the Syrian government";

ii.   The July 1985 assassination of Jordanian diplomat Ziad Sati in Ankara, Turkey. Turkish authorities issued an arrest warrant for the Syrian Embassy Second Secretary, Mohammed Darwichi. The chief defendant in the trial, who was employed as a translator in the Jordanian embassy, carried a Syrian passport. During the trial, he confessed to having worked for Syrian intelligence, stating that his control officer was a Syrian diplomat in Turkey who had given the order to assassinate Sati;

iii.   The hijacking of Egypt Air Flight 648 on November 23, 1985, where this Court has found the Syrian Arab Republic liable for its sponsorship and support of terror;

iv.   The simultaneous massacres of air passengers at the TWA and El Al ticket counters at the Fiumicino Airport in Rome, Italy, where this Court has found the Syrian Arab Republic liable for its sponsorship and support of terror; and the Schwechat Airport in Vienna, Austria, which said Rome and Vienna Airport Attacks were committed by Abu Nidal terrorists, with the support and aid of Syria, on December 27, 1985;

v.   The March 29, 1986 bombing of the German-Arab Friendship Union in West Berlin, injuring 11 persons, which, according to the sworn statement of one of

the convicted terrorists, Amad Hasi, was carried out using a bomb that he picked up at the Syrian Embassy in East Berlin from a Syrian Air Force intelligence officer;

vi.   The attempted bombing of El Al Flight 016 on April 17, 1986, which, according to the confession that convicted Jordanian terrorist Nezar al- Hindawi, the brother of Ahmad Hasi, made to British police, was planned with the help of Syrian military intelligence officers (including *inter alia* the Chief of Syrian Air Force Intelligence Brigadier General Nuhammad al-Khuli, one of President Hafez Al-Assad's closest aides), and the Syrian Ambassador in London, who supplied him with a Syrian passport, $12,000 in funding, Semtex explosives which he planted in the luggage of his pregnant Irish fiancée and a disguise as a Syrian Arab Airlines crew member;

vii.   The attempted bombing of an El Al plane on June 26, 1986, in Madrid, Spain, by a Spanish member of the Syrian sponsored Abu Musa terrorist organization, carrying a Syrian passport; and

viii.   Support, sponsorship and safe haven of the Abu Nidal Organization, the Abu Musa Group, the Popular Front for the Liberation of Palestine, the Japanese Red Army, the Kurdish Labor Party, the Armenian Secret Army for the Liberation of Armenia, the Lebanese Armed Revolutionary Faction, among other terrorist organizations.

107.     In addition, Syria has provided material support and sponsorship to HAMAS, Hezbollah, Palestinian Islamic Jihad, Zarqawi and AQI, ISIS, among other terrorist organizations and terrorists.

108.     ISIS occupies a large portion of eastern Syria and western Iraq, having established its headquarters in Raqqa, Syria. Significantly, there are vast oil fields in the areas under its control from which ISIS is able to drill and collect gas and oil.

109.     ISIS gas and oil sales, including to the Syrian Arab Republic, have become its largest source of money, surpassing travel tolls, private donations, and all other sources of revenue allowing ISIS to maintain control of its so-called "caliphate."

110.     Syria knowingly purchases oil from ISIS as part of its close economic cooperation with The Islamic State. Oil and gas sales are ISIS' largest source of funds with the vast majority of its oil sales to the Syrian government and private Iraqi buyers. As of 2014, sales to Syrian and Iraqi buyers, including Bashar Al-Assad's government, accounted for $1 million in revenues for ISIS per day.

111.     In addition to economically supporting ISIS, the regime uses ISIS to further its political agenda - as it has historically used other designated terrorist organizations. By pursuing policies that help ISIS maintain control and bolster its forces, Syria has attempted to gain support of western governments.

112.     In 2011, Syria emptied its prison of Islamist prisoners with the intention of Islamacizing and militarizing what had been a peaceful uprising against the repressive Alawite minority that Bashar Al-Assad heads. By Islamacizing and militarizing the protestors, the regime forced western countries to support the war against extremists while the government focused its efforts on fighting the more moderate rebels.

113.     The Syrian regime has for the longest time largely enabled ISIS solders, allowing them to occupy Syrian cities. While ISIS made territorial gains, the Syrian regime bombarded rebel-held suburbs such as those around Damascus and Aleppo.

114.     It is well known that ISIS' headquarters are in Raqqa, Syria – where, according to the U.S. Department of State, from which ISIS plots most of its external operations including but not limited to the 2016 Brussels Airport attack – yet there have been no attempts by government forces to expel the terrorists from the surrounding regions with the exception of Palmyra, which the Assad regime temporarily re-occupied with the support of Russia through minimal fighting.

115.     Instead of fighting the extremists, the regime has engaged in a civil war against what were peaceful popular protestors while a U.S. led coalition hunts ISIS.

116.     The U.S. Department of State, in its 2015 Country Reports on Terrorism, found that Syria continues to embrace terrorism as an instrument of policy.

117.     The report further noted ISIS operatives who helped carry out attacks all over the world remain at large in Syria despite being wanted by neighboring and western governments.

118.     The report also expresses concerns about the proliferation of weapons that Syria has been giving to FTOs.

119.     Additionally, it states that the Syrian government has created an environment which encourages terrorist recruits to come to Syria and enables FTOs, specifically ISIS, to plot external attacks without fear of being stopped or imprisoned.

120.     Syria has continued to be continuously designated as a State Sponsor of Terrorism since 1979 and has continued to sponsor designated FTOs in an unrepentant and unapologetic manner, intentionally providing material support, logistics, safe haven, aid and assistance to those who maim and kill innocent American citizens and others through acts of terrorism.

121.     The provision of material support and resources to The Islamic State, a known and designated FTO, by the Syrian government, acting directly and by and through individual governmental leaders, representatives and instrumentalities as named in this Complaint, constitute violations of applicable and numerous United States laws, thereby rendering the Syrian Defendant, liable for its illegal acts and deeds.

### COUNT I
### 28 U.S.C. § 1605A(c), PRIVATE RIGHT OF ACTION

122.     Paragraphs 1 through 121 are incorporated herein as if fully set forth herein. The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).  Defendant and its agents were acting within the scope of their office, employment, or agency in committing the acts alleged herein, including planning and carrying out the Brussels Airport and Metro Attack on March 22, 2016.

123.     As a direct and proximate result of the willful, wrongful, intentional, reckless and heinous acts of ISIS members, whose acts were funded and supported by the Syrian Arab Republic and it agents, Plaintiffs suffered, *inter alia*, physical pain and suffering, mental anguish, emotional pain and suffering, solatium damages and/or economic losses resulting from Defendant's acts.

124.     Pursuant to 28 U.S.C. § 1605A(c), Plaintiffs, each of whom are U.S. nationals may assert a cause of action against Defendant for their personal injuries, including but not limited to, their physical pain and suffering, mental anguish, emotional pain and suffering, solatium damages and/or economic losses  that were caused by the provision of material support or resources for such an act performed or provided by an official, employee, or agent of Defendant while acting within the scope of his or her office, employment, or agency

125.     Accordingly, as a result of Defendant's actions, Plaintiffs seek compensatory damages.

126.     WHEREFORE, Plaintiffs demand that judgment be entered against Defendant in such amounts as are permitted by law and in accordance with this Court's prior determinations of awards and Judgments on behalf of similarly situated Plaintiffs for their compensatory damages, and otherwise as permitted by this Court.

## COUNT II
## LOSS OF SOLATIUM

127.     Paragraphs 1 through 126 are incorporated herein as if fully set forth.

128.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendant, the Plaintiffs family members of the victims each suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims.

129.     Accordingly, Plaintiffs family members bring claims for loss of solatium against Defendant pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia.

130.     WHEREFORE, the individual Plaintiffs demand that judgment be entered against the Defendant in an amount to be proven for their compensatory damages, and otherwise as permitted under applicable law by this Court.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

131.     Paragraphs 1 through 130 are incorporated herein as if fully set forth.

132.     On March 22, 2016, members of ISIS, with the support and aid of the Defendant, willfully, violently, and forcefully caused explosive device(s) to detonate at the Brussels Airport.

133.     The act of detonating an explosive charge at the Brussels Airport on March 22, 2016 constituted extreme and outrageous conduct on the part of ISIS members, whose acts were intended to cause the infliction of physical and emotional harm and distress upon the injured and killed victims, and their families, and were funded and supported by the Syrian Arab Republic.

134.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of ISIS members, whose acts were funded and supported by the Syrian Arab Republic, Plaintiffs suffered severe emotional distress, entitling them to compensatory damages.

135.     Each Plaintiff family member may assert a cause of action for intentional infliction of emotional distress against Defendant in connection with the willful, wrongful, intentional, and reckless actions of ISIS members.  Such cause of action may be asserted pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia.

136.     WHEREFORE, Plaintiffs demand that judgment be entered against the Defendant in an amount to be proven for their compensatory damages, and otherwise as permitted by this Court.

## COUNT IV
## PUNITIVE DAMAGES

137.     Paragraphs 1 through 136 are incorporated by reference as though fully set forth herein.

138.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendant, each of the Plaintiffs suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship and solatium as a result of being injured in the attack or as a result of their family member being injured in the Brussels Airport attack.

139.     Under 28 U.S.C. §1605A and/or state and foreign law, the Plaintiffs, and each of them, are entitled to an award of punitive damages to be assessed and awarded against the Defendant for its heinous, reprehensible and unforgiving conduct in perpetrating unrelenting terror upon the United States of America, her citizens, and the Plaintiffs, and each of them.

140.     The purposes of punitive damages is to punish, for retribution and to deter further acts of terror by the Defendant and other terror organizations and those who provide material support for the sponsorship of terror.  This allows, and under the circumstances requires, a message to be sent by this Court to the Syrian Arab Republic that it's past and ongoing sponsorship of terror will not be countenanced by this Court nor by the United States of America.  An award of not less than one billion dollars in punitive damages should be assessed against the Defendant, and Judgment should be entered on behalf of the Plaintiffs, and each of them, in such amount of punitive damages, to be shared among them in direct proportion to the other damages awarded to each of the Plaintiffs, and as the interests of justice may allow.

141.     WHEREFORE Plaintiffs demand that judgment be entered for punitive damages, jointly and severally, against Defendant, in the amount of $1 BILLION DOLLARS ($1,000,000,000).

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, pray that the Court:

A. Grant Plaintiffs judgment in their favor against Defendant on Counts I through IV; and

B. Award Plaintiffs, and each of them;

    1.  Compensatory damages against Defendant, the Syrian Arab Republic in the amount to be proven;

    2.  Solatium damages against Defendant, the Syrian Arab Republic, in the amount to be proven;

    3.  Punitive damages against Defendant, the Syrian Arab Republic, in the amount of ONE BILLION DOLLARS ($1,000,000,000);

    4.  Pre-judgment interest as allowed by law;

    5.  Reasonable costs and expenses;

    6.  An award of reasonable attorneys' fees; and

Such other and further relief which the Court may determine to be just and equitable under the circumstances and as permitted under applicable law for the heinous acts of terror committed and/or supported by the Defendant.

Dated: October 10, 2017          Respectfully submitted,

HEIDEMAN NUDELMAN & KALIK, PC
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone:  202-463-1818
Telefax:      202-463-2999

By: __/s/_ *Richard D. Heideman*
    Richard D. Heideman (No. 377462)
    Noel J. Nudelman (No. 449969)
    Tracy Reichman Kalik (No. 462055)

*Counsel for All Plaintiffs*