### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAIM WINTERNITZ et al.,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>SYRIAN ARAB REPUBLIC,<br><br>    *Defendant*. | Civil Action No. 17-2104 (TJK) |

### <u>MEMORANDUM OPINION</u>

Chaim Winternitz was traveling home to Israel after attending a wedding in Brussels, Belgium in March 2016.  He had just stepped away from his wife Esther, and daughter, B.W., in the Brussels Airport when suicide bombers detonated a series of explosives.  One of the bombs riddled his body with shrapnel, shattered his right leg, and left him badly burned.  The Islamic State of Iraq and the Levant—more commonly known as ISIS—took responsibility for the attack.  This case was brought by Winternitz and some of his family members against the Syrian Arab Republic under the Foreign Sovereign Immunities Act.  They assert that Syria provided material support to ISIS such that it should be held liable for what happened to them.  For the reasons explained below, the Court agrees, and will grant the pending motion for default judgment, enter judgment against Syria, and award damages of $108,928,124.

### I.    Background

#### A.    Factual Background

On March 22, 2016, an ISIS terrorist cell carried out coordinated suicide bombings at the Brussels Airport and a nearby metro station that killed 32 and wounded more than 300.  Chaim

Winternitz, his wife Esther, and their minor daughter B.W., were in the airport at the time, travelling home to Israel from a wedding in Belgium.  ECF No. 14-3 ¶ 10.  The bombs went off when he was separated from the two of them; the second bomb tossed him in the air, severely burned much of his body, and riddled him with shrapnel.  *Id.* ¶ 11.  As he lay on the ground unable to move, he recited a Jewish prayer for those approaching death.  *Id.* ¶ 12.  Eventually, he learned that his wife and B.W. were uninjured, and he was taken to a hospital, where he underwent extensive surgery.  *Id.* ¶¶ 21–33; *see also* Ex. 2.

After Winternitz's first surgery, his injuries continued to cause him severe pain and require regular medical attention.  ECF No. 14-3 ¶¶ 38, 42.  He spent much of his time immobilized, which caused pressure wounds and breathing problems, which had to be treated by painkillers and oxygen.  *Id.* ¶ 38.  After a week, he was stable enough to be transferred to a hospital back in Israel, where he remained for three more weeks.  *Id.* ¶ 50; *see also* Ex. 3.  Then he received two more surgeries; and later, he needed three more to fix his injured leg and ruptured eardrum, and to address his skin loss.  *Id.* ¶¶ 50–51.  He also required physical therapy and chiropractic treatment to regain limited mobility in his leg.  *Id.* ¶¶ 58–59; *see also* Exs. 4, 5.

Still, Winternitz has not fully regained hearing in one ear, he struggles to walk, and he suffers from post-traumatic stress disorder.  ECF No. 14-3 ¶¶ 53, 56, 77.  These ongoing injuries make it hard for him to travel, complete household activities, and climb stairs, and have caused him to move to an apartment without stairs.  *Id.* ¶¶ 52–57.  He can no longer participate as fully in his family or religious life, since he cannot play with his children, stand for prayers, or dance.  *Id.* ¶¶ 66–70.  He takes medication for his high blood pressure, which is attributable to the attack and the ongoing psychological strain caused by his injuries.  *Id.* ¶¶ 73–74.

Before the attack, Winternitz was a special education teacher, and he was studying to be a therapist.  ECF No. 14-3 ¶¶ 99–106.  He was passionate about his work with students and was looking forward to providing them more support and services.  *Id.*  The physical and emotional pain caused by the attack forced him to quit his job, which in turn caused him to lose "much of [his] livelihood and [his] sense of worth."  *Id.* ¶ 101.  Israel's national social security agency has determined that he is indefinitely disabled.  *Id.* ¶ 98.

Winternitz's children, father, and siblings have also been profoundly affected by the Brussels Airport attack and the injuries it caused him.  His daughter B.W. was at the airport that day.  ECF No. 14-5 ¶¶ 9–12.  She personally witnessed the frantic aftermath of the suicide bombings, including victims with serious injuries.  *Id.*  She waited for hours before learning whether her father had survived.  *Id.*  As a result, B.W. was severely traumatized by the attack and sees a therapist weekly.  *Id.* ¶¶ 17–19.  Winternitz's four other children—A.W., D.W., Mi.W., and Mo.W.—were also traumatized by what happened to their father, and each receive counseling at their school.  *Id.* ¶ 16.  Jacob Winternitz, Chaim's Winternitz's father, was in synagogue when he received a panicked call from his son about the attack.  ECF No. 14-6 ¶ 9.  He made it to the hospital that day and was shocked by his son's injuries.  *Id.* ¶¶ 17–18.  He continues to suffer from intense feelings of fear and sadness over his son's injuries and their effect on his life.  *Id.* ¶¶ 23–25.  Ester Winternitz, Chaim Winternitz's sister, suffers from ongoing anxiety and nightmares, high blood pressure, and a fear of air travel because of what happened to her brother.  ECF No. 14-7 ¶¶ 11–16.  Faige (Winternitz) Quitt, another sister, also suffers from a fear of air travel, and a fear of crowded public spaces, which forced her to quit her job, and she has been diagnosed with vertigo "as a result of the shock and trauma of the terror attack."  ECF No. 14-8 ¶¶ 19–24, Ex. 2.  A third sister, Yitel Winternitz, suffers from acute anxiety and a fear of airports; she also struggles with sleeping and

has to rely on sleeping pills.  ECF No. 14-10 ¶¶ 15–18.  A brother, Moshe Winternitz, is also now afraid to travel, and has had his life disrupted by the need to accompany his brother to many of his medical procedures.  ECF No. 14-9 ¶¶ 26–28.

### B.    Procedural Background

In October 2017, Chaim Winternitz and his five children, father, and four siblings sued Syria for the physical and mental injuries they suffered because of the attack on the Brussels Airport.  *See* ECF No. 1.  They first tried to serve Syria via DHL by mailing a copy of the Summons, Complaint, and Notice in November 2017, but service was not completed.  ECF Nos. 6 & 7.  Plaintiffs then requested that the State Department help serve Syria by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4).  ECF No. 7.  In March 2018, Syria was served with a copy of the Summons, Complaint, and Notice of Suit through the embassy of the Czech Republic in Damascus, Syria. ECF No. 11.  Syria never responded to the complaint or otherwise appeared.  The clerk entered default against Syria, ECF No. 13, and Plaintiffs moved for default judgment.  ECF No. 14.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," and so "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Still, "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  A court retains its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*,

82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.  And "plaintiffs retain 'the burden of proving personal jurisdiction, [and] they can satisfy that burden with a *prima facie* showing.'" *Id.* at 7 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)).  And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002).

As a result, the D.C. Circuit has instructed that "courts have the authority—indeed . . . the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  But uncontroverted factual allegations supported by admissible evidence may be taken as true.  *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).  And § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d

751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding." *Owens*, 864 F.3d at 785. "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* Thus, courts are given "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Id.* And this discretion extends to the admission of expert testimony, often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citations omitted). Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate" and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Id.* For these reasons, the Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

## III.   Analysis

In an FSIA case, "[a] default judgment may be entered when (1) the Court has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017);

*accord Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 32 (D.D.C. 2018).  The Court takes up each in turn.

### A.      Subject-Matter Jurisdiction

The Court may exercise "original jurisdiction" over a foreign state "without regard to amount in controversy" in "nonjury civil action[s]" seeking "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."  28 U.S.C. § 1330(a).  The first three prerequisites are easily met here.  First, Plaintiffs have brought a nonjury civil action.  *See* ECF No. 1-2 at 2. Second, this is an action seeking relief *in personam*, rather than in *rem*.  *See Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 34 (D.D.C. 2016) (holding that a lawsuit seeking damages from Syria to compensate for a suicide bombing is seeking *in personam* relief).  Third, Syria is a foreign sovereign.  *Id.* at 33.  The remaining question is whether Syria is entitled to immunity under the FSIA or another international agreement.

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies.  *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  Plaintiffs invoke the FSIA terrorism exception, which provides federal courts with subject-matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" an enumerated terrorist act.  28 U.S.C. § 1605A(a)(1); *see also* 28 U.S.C. § 1330.  Plaintiffs must prove three elements relevant here to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimant or victim was a national of the United States at the time of the act; and (3) the damages sought are for personal injury or death caused by

the act of terrorism.[1]  *See Akins*, 332 F. Supp. 3d at 32; 28 U.S.C. § 1605A.  Plaintiffs, like those in another case brought against Syria for the same Brussels Airport attack, have met their burden at this stage on all these elements.  *See Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 WL 5422844 (D.D.C. Sept. 10, 2020).

### 1.  Syria Was Timely Designated a State Sponsor of Terrorism

The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since.  *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33,956–57 (May 21, 1980).

### 2.  Plaintiffs Are U.S. Nationals

Plaintiffs are and were at all relevant times United States citizens.  *See* ECF No. 14-3 ¶ 2; ECF No. 14-5 ¶ 2, 4–7; ECF No. 14-6 ¶ 2; ECF No. 14-8 ¶ 2; ECF No. 14-9 ¶ 2; ECF No. 14-10 ¶ 2.  And United States citizens are nationals for FSIA purposes.  28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### 3.  Syria's Actions Qualify for the Terrorism Exception

The last element requires that Plaintiffs seek damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  As described below, Plaintiffs have met

---

[1] The statute also requires a plaintiff to offer to arbitrate a claim against a foreign state in that foreign state when the acts causing injury occurred there.  But here, the acts occurred in Brussels, Belgium, not Syria.  Thus, Plaintiffs need not have offered arbitration to establish subject-matter jurisdiction.  *See* 28 U.S.C. § 1605A(a)(2)(A)(iii); *see also* ECF No. 1 ¶¶ 25–33.

their burden by showing that they were injured by ISIS's extrajudicial killing at the Brussels Airport, and that Syria's provision of material support to ISIS caused the attack.[2]  *See* ECF No. 14-1 at 12–24.

### a.      The Brussels Airport Attack Was an Extrajudicial Killing

An "[e]xtrajudicial killing" is defined for purposes of the FSIA—by means of the Torture Victim Protection Act of 1991—as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Torture Victim Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note); 28 U.S.C. § 1350(3)(a); *see also* 28 U.S.C. § 1605A(h)(7).  The D.C. Circuit has interpreted this text to include three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a constituted court."  *Owens*, 864 F.3d at 770.  And as the *Doe* court already concluded, a "suicide bombing in a crowded airport that resulted in many deaths would plainly meet those requirements."  *Doe*, 2020 WL 5422844, at *8.[3]  The Court notes that Plaintiffs "need only establish that the bombing here was authorized, deliberate, and that there were casualties.  It is not necessary, however, for one of the plaintiffs to have died in the

---

[2] Plaintiffs suggest at times that Chaim Winternitz was also a victim of torture as defined by the Torture Victim Prevention Act, *see* Coml. at 3 & ECF No. 14-1 at 7, but "mere reference to an issue does not present it properly for review," *Williams v. Romarm, SA*, 756 F.3d 777, 783 n.2 (D.C. Cir. 2014).  Thus, the Court will not consider this argument.

[3] *See* U.S. Dep't of State, *Country Reports on Terrorism 2016*, https://www.state.gov/wp-content/uploads/2019/04/crt_2016.pdf (last visited March 28, 2022).  This report, which includes a basic description of the attack, is admissible as a public record under Federal Rule of Evidence 803(8).  The D.C. Circuit found a similar report admissible because it "fit[s] squarely within the public records exception" provided in Federal Rule of Evidence 803(8)(A)(iii).  *Owens*, 864 F.3d at 792.

attack in order for the state-sponsor-of-terrorism exception to apply."  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *see also Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019) (collecting cases).

> **b.**   **Syria's Material Support for ISIS Caused the Brussels Airport Attack**

To "establish the court's jurisdiction, the plaintiffs in this case must show (1) [Syria] provided material support to [ISIS] and (2) its material support was a legally sufficient cause of the [] bombings."  *Owens*, 864 F.3d at 778; *see, e.g.*, *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 135–36 (D.D.C. 2019).   Under the relevant statute, material support or resources is "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" under the FSIA to have the "meaning given that term in section 2339A of title 18.").

To begin with, Plaintiffs have presented sufficient evidence that ISIS was responsible for the Brussels Airport attack.  ISIS issued several claims of responsibility for the attack, including

in its English-language publication, as Plaintiffs' expert Dr. Matthew Levitt describes in his report.[4]   *See* ECF No. 14-2 at 7–8.   The State Department determined that ISIS was responsible.[5]   Dr. Levitt reached the same conclusion, in part based on ISIS publications and government reports that link the bombers who carried out the attack to ISIS and Syria and that identify the ISIS commanders in Syria who oversaw the attack.   *Id.* at 2, 7–11.   The *Doe* Court also determined that ISIS executed the bombings, based on largely the same evidence.   *Doe*, 2020 WL 5422844, at *9.

Plaintiffs have also provided enough proof, at the default stage, that Syria provided material support and resources to ISIS.   They rely on the opinion of Dr. Levitt, who in turn relies in part on information from the State and Treasury Departments, foreign state reports, and interviews with those having expertise in ISIS' organizational tactics.   Dr. Levitt describes Syria's earlier support for ISIS's predecessor organizations, including AQI, in part to facilitate the passage of jihadist fighters into Iraq.   *See* ECF No. 14-2 at 25–34.   Evidence like that on which he relies has been found sufficient in FSIA cases to show Syria's material support for AQI.   *See Thuneibat*, 167 F. Supp. 3d at 36 (finding that Syria materially supported AQI through establishing a transit pipeline for foreign fighters and allowing AQI to operate unmolested within Syria); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 68 (D.D.C. 2008) (finding that Syria materially supported AQI

---

[4] Dr. Levitt is a "noted expert in international terrorism" who has served as an expert witness in several FSIA cases.   ECF No. 14-2 at 3, 38–39.   Given his skill, knowledge, education, experience, and training, this Court finds—as it did in another case—that he is qualified as "an expert on the Syrian government's relationship with ISIS's predecessor organizations and ISIS itself."   *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 133 (D.D.C. 2021).

[5] U.S. Dep't of State, *Country Reports on Terrorism 2016*, https://www.state.gov/wp-content/uploads/2019/04/crt_2016.pdf (last visited March 28, 2022).

by providing a logistical hub for its operations and supporting its recruitment efforts by including the aforementioned AQI recruiter Abu Qaqa on the Syrian payroll).[6]

Then, as the Arab Spring pro-democracy protests in 2011 led to civil war in Syria, Dr. Levitt opines that the Syrian regime made the strategic decision to facilitate the continued survival of ISIS, in part to portray all the regime's opponents as terrorists. *See* ECF No. 14-2 at 14–25. He relies in part on first-hand interviews with regime defectors, statements from U.S. officials, and other government reports and official government designations. *Id.* Dr. Levitt focuses on three specific ways that Syria did so. *Id.* at 17–25. First, it provided a haven for ISIS's operations in Syria by refraining from attacking their positions. Second, Syria released key ISIS members from its prisons with the specific purpose of strengthening ISIS, and many of these terrorists later assumed leadership roles in the organization. Third, Syria provided key financial assistance to ISIS by the purchasing oil from ISIS and wheat from ISIS-controlled areas, as well as by allowing Syrian banks to provide ISIS financial services. Again, other courts have relied on

---

[6] Syria has provided safe haven and support to terrorist organizations within its borders for decades. *See* 45 Fed. Reg. 33,956 (May 21, 1980). In the early 2000s, ISIS's predecessors operated from Syria and received funding and resources from Syria. *See Sotloff*, 525 F. Supp. 3d at 127; *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193–95 (D.D.C. 2017); *Thuneibat*, 167 F. Supp. 3d at 36; *Gates*, 580 F. Supp. 2d at 59–63. The Court takes judicial notice of the facts found in these opinions relating to Syria's support for ISIS's predecessors, which it may do under Federal Rule of Evidence 201(b). *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing cases). "Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Id.* And "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'" *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (citation omitted). That said, the Court, as it must, reviews the evidence and reaches its own, independent findings of these facts here. *Rimkus*, 750 F. Supp. 2d at 172.

essentially the same evidence to conclude that Syria provided material support to ISIS.  *See Sotloff*, 525 F. Supp. 3d at 127–132; *Doe*, 2020 WL 5422844, at *9–12.[7]

Plaintiffs have also shown that Syria's material support for ISIS was a legally sufficient cause of the Brussels Airport attack.  *See Owens*, 864 F.3d at 778 (requiring plaintiffs to show that the foreign sovereign's material support is a legally sufficient cause of the terrorist attack at issue). Plaintiffs need not show that Syria specifically intended to cause the attack; they need only demonstrate proximate cause.  That is, they must show "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004) (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)).  To establish this causal connection, a defendant's actions need only have been "substantial factor" in the sequence of events that caused the plaintiff's injury and the injury must be a "reasonably foreseeable consequence" of defendant's conduct. *Owens*, 864 F.3d at 794.  In other FSIA cases, evidence found to meet this standard included financial support for the terrorist organization, logistical support for insurgent training, the provision of weapons, and the bolstering of operational capacity.  *See, e.g.*, *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 48 (D.D.C. 2019).  Plaintiffs have shown all the above.  In Dr. Levitt's opinion, "[w]ithout the support and tolerance of the Syrian regime, [ISIS] could not have evolved . . . into the powerful terrorist group it became, controlling large swaths of territory and engaging in truly barbaric acts of terrorism . . . including the March 22, 2016 attack on Brussels Airport." ECF No. 14-2 at 2.  The *Doe* court also reached this conclusion.  2020 WL 5422844, at *11.

---

[7] The Court also takes judicial notice of the detailed facts found in these opinions relating to Syria's material support for ISIS.

Plaintiffs' injuries were also a reasonably foreseeable consequence of Syria's actions supporting ISIS. *See Roth*, 78 F. Supp. 3d at 394 (stating that the FSIA sets a relatively low bar for proximate cause). In other cases, sufficient evidence of foreseeability included backing the organization despite knowledge of its violent tactics and encouragement of an escalation of terrorist behavior. *See id.* (finding injuries stemming from a bombing were a foreseeable result of Iran's material support of a terrorist organization because Iran encouraged an increase in terrorist activities); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012) (finding injuries because of a kidnapping were a foreseeable result of Syria's support of PKK because Syria bankrolled the organization, knowing that they used violent tactics). Syria's longtime support of AQI facilitated violence in Jordan, Iraq and elsewhere. ECF No. 14-2 at 25–34. And Syria continued to support ISIS for strategic reasons. Courts have found that Syria's continued support for ISIS's predecessors, despite their violent conduct, is enough to prove that future attacks by ISIS were reasonably foreseeable. *See Sotloff*, 525 F. Supp. 3d at 139–140. And again, the *Doe* court reached this conclusion about the Brussels Airport attack. *Doe*, 2020 WL 5422844, at *12.

\*　　　\*　　　\*

For these reasons, the Court finds that it has subject-matter jurisdiction.

**B.    Personal Jurisdiction**

To impose judgment on a foreign state under the FSIA, this Court must also have personal jurisdiction over Syria. Personal jurisdiction over a foreign government turns on a showing of (1) subject-matter jurisdiction under the FSIA; and (2) proper service under the FSIA. 28 U.S.C. § 1330(b). As Plaintiffs have already satisfied the first requirement, the Court turns to the second.

28 U.S.C. § 1608(a) lists four methods of serving a foreign government, in the order in which plaintiffs must attempt them:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a); *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 87 (D.D.C 2018) ("Section 1608(a) provides four methods of service in descending order of preference" (internal quotation marks omitted)).

Taking Section 1608(a)'s methods of service in order, because Syria does not have a special arrangement for service with Plaintiffs, and it is not party to an international convention on service, Plaintiffs did not need to attempt service in accordance with § 1608(a)(1) or (a)(2). *See Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 155 (D.D.C. 2019) (holding that Syria is not a party to any international convention on service of legal documents). Plaintiffs tried to serve Syria under Section 1608(a)(3) on November 6, 2017. ECF Nos. 6 & 7. When the courier could not deliver the package and it was returned to them, they pursued service through diplomatic chan-

nels under Section 1608(a)(4), by diplomatic note forwarded by the State Department to the Foreign Interests Section of the Embassy of the Czech Republic.  ECF No. 11.  Although Syria refused to accept delivery, service was still proper.  *See Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52–53 (D.D.C. 2008).

Thus, because the Court has subject-matter jurisdiction over Plaintiffs claims and Syria was properly served under 28 U.S.C. § 1608(a)(4), the Court has personal jurisdiction over Syria.

### C.    Liability

Having already concluded that the Court possesses subject-matter jurisdiction, little else is needed to show that Syria is liable to Plaintiffs for their injuries.  28 U.S.C. § 605A(c).  The private right of action in the FSIA terrorism exception provides that a foreign government is liable to a U.S. citizen "for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. §§ 1605A(a)(1), (c).  As a result, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law" if the plaintiff is a citizen of the United States.  *Fritz*, 320 F. Supp. 3d at 86–87; *see Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) ("Essentially, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met.").

As already mentioned, Plaintiffs are U.S. citizens.  28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).  As a result, and for all the reasons already explained, they may rely on the cause of action in the terrorism exception to establish Syria's liability.[8]  *See Owens*, 864 F.3d at 809.

---

[8] Some courts in this district have held that § 1605(A)(c) provides a cause of action but "does not

## IV.    Damages

Under the FSIA, a foreign state is liable to victims of state-sponsored terrorism for money damages including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C.A. § 1605A(c).  "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable esti-mate' consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (D.D.C. 2015) (some internal quotation marks omitted) (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105,115–16 (D.D.C. 2005)); *accord Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286, 289 (D.D.C. 2015).  In deter-mining the "reasonable estimate," courts may look to expert testimony and prior awards for com-parable injuries.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012). But in a default case, the Court may not exceed the amount demanded by the plaintiff.  *See* Fed. R. Civ. P. 54(c).  As discussed below, Plaintiffs request and the Court will award both compensa-tory and punitive damages.  The Court will also award post-judgment interest, but it will not award prejudgment interest, costs, or attorneys' fees.

---

itself provide the 'substantive basis' for claims brought under the FSIA." *Force v. Islamic Repub-lic of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020).  Thus, FSIA plaintiffs must "prove a [specific] theory of liability." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010). Such theories of liability are based on "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises." *Maalouf v. Islamic Republic of Iran*, No. 16-0280, 2020 WL 805726, at *5 (D.D.C. Feb. 18, 2020).  Plaintiffs mention "sola-tium/intentional infliction of emotional distress" in the context of damages but do not otherwise articulate a "theory" of liability.  "The Court, however, will not exalt form over substance to dis-miss [their] action." *Rimkus*, 750 F. Supp. 2d at 176.  The facts Plaintiffs have pled and established show liability under the theories of battery, assault, and intentional infliction of emotional distress. *See Doe*, 2020 WL 5422844, at *13–14.

A.      **Compensatory Damages**

1.      **Chaim Winternitz**

As the record reflects, Winternitz was physically and psychologically injured in the Brussels Airport attack.  He still suffers from these injuries, and because of them, he cannot work.  He seeks damages to compensate him for both his pain and suffering and economic losses.

As for pain and suffering, damages "for surviving victims are determined based upon an assessment of such factors as the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  *Valore*, 700 F. Supp. 2d at 83–84.  For the pain and suffering of individuals who survive terrorist attacks, courts have adopted a baseline award of $5 million.  *Id.* at 84.  This baseline amount has been found appropriate for a victim of terrorism who suffered a broken leg and shrapnel wounds, as well as lasting and severe psychological harm.  *Peterson*, 515 F. Supp. 2d at 54.  Winternitz's injuries are very similar.  Thus, the Court will award him $5 million for his pain and suffering.

"The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case."  *Reed*, 845 F. Supp. 2d at 214 (citing *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009)).  Dr. Chad Staller of the Center for Forensic Economic Studies has estimated Winternitz's total economic loss, including but not limited to his loss of income, as between $5,516,294 and $5,732,031.  *See* ECF No. 14-4 at 11.  The difference between the two figures results from a lack of certainty over when Winternitz would have retired—with the smaller number assuming retirement at the point of eligibility for retirement benefits and the larger number assuming retirement at the average age an Israeli man leaves the

workforce. *Id.* at 4, 14.  The Court finds that, because the record shows that Winternitz was dedicated to and passionate about his work, he is entitled to the presumption that he would have worked for at least as long as the average Israeli man.  *See* ECF No. 14-3 ¶¶ 99–106.  Thus, the Court awards him economic damages of $5,732,031.

### 2.    B.W.

B.W. is Chaim Winternitz's minor daughter who was present at the airport during the attack.  Fortunately, she was not physically injured.  Still, she suffers severe emotional trauma because of what she saw that day.  *See* ECF No. 14-3 ¶ 19.  In similar cases in which a survivor does not suffer any serious physical injuries, but does suffer severe emotional injuries, courts have awarded damages of $1.5 million.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 85; *Akins*, 332 F. Supp. 3d at 41.  The Court finds that B.W. is entitled to the same.

### 3.    Chaim Winternitz's Other Children, Father, and Siblings

The remaining plaintiffs are members of Chaim Winternitz's family who were not present during the attack but who have suffered severe emotional distress because of what happened to him.  Courts often award damages for loss of solatium or intentional infliction of emotional distress in such cases.  *Pennington v. Islamic Republic of Iran*, No. CV19-796 (JEB), 2021 WL 2592910, at *4 (D.D.C. June 24, 2021) ("[I]mmediate family members of terrorism victims may state a claim for IIED even if they were not present at the site of the attack.").  Such awards are "functionally identical" and meant to compensate persons for the mental anguish resulting from injury to a loved one and loss of their companionship.  *See Roth*, 78 F. Supp. 3d at 402.  When an immediate family member was injured, but not killed, courts have adopted as a general framework that spouses, parents, and siblings receive baseline awards of $4 million, $2.5 million, and $1.25 million, respectively.  *See Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011).  Children of an injured victim generally receive a baseline award of $1.5 million.  *See Schooley v.*

*Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *78 (D.D.C. June 27, 2019).  In

*Doe*, the court found these baseline amounts to be appropriate for the spouse and child of a victim

injured in the Brussels Airport attack, both of whom suffered severe mental anguish as a result.

*See Doe*, 2020 WL 5422844, at *16–17.

 The Court finds these baseline awards appropriate here as well.  Thus, because Chaim

Winternitz's children—A.W., B.W., D.W., Mi.W, and Mo.W—each suffer from mental anguish

as a result of their father's injuries, ECF No. 14-5 ¶¶ 23–43, the baseline award of $1.5 million is

appropriate for them.  Chaim Winternitz's siblings—Ester Winternitz, Faige Quitt, Moshe Win-

ternitz, and Yitel Winternitz—also suffer in the same way because of what happened to their

brother.  ECF No. 14-7 ¶¶ 8–21; ECF No. 14-8 ¶¶ 7–24; ECF No. 14-9 ¶¶ 17–28; ECF No. 14-10

¶¶ 11–20.  Thus, the baseline award of $1.25 million is proper for them.  And because his father

suffers from the same trauma, ECF 14-6 ¶¶ 23–26, the baseline award of $2.5 million is suitable.

### B. Punitive Damages

 Punitive damages are awarded not to compensate the victim, but to punish and deter future

outrageous conduct by the foreign state.  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44,

55 (D.D.C. 2012) (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61

(D.D.C. 2009)); *Estate of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 29–30 (D.D.C.

2009).  In deciding whether to award punitive damages, courts look to four factors: "(1) the char-

acter of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants

caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."

*Doe*, 2020 WL 5422844, at *17 (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15,

30 (D.D.C. 2008)).  The Court agrees with the *Doe* court that "[a]ll four factors weigh in favor of

awarding punitive damages [for the Brussels Airport attack]: the targeted bombing of a crowded

airport was unconscionable, the harm it caused was substantial, the need to deter terrorism is high, and Syria is a wealthy sovereign." *Doe*, 2020 WL 5422844, at *17; *see also Colvin*, 363 F. Supp. 3d at 163 (weighing all four factors in favor of awarding punitive damages against Syria, including that it is a state with substantial wealth).  Thus, punitive damages are warranted here.

The amount of punitive damages is another question, and courts have used several methodologies to calculate them.  Some courts award punitive damages in an amount three to five times the defendant's "annual expenditure on terrorism."  *Acosta*, 574 F. Supp. 2d at 31; *Valore*, 700 F. Supp. 2d at 89–90.  This approach is "considered more appropriate for cases involving 'exceptionally deadly attacks."  *Doe*, 2020 WL 5422844, at *17.  But this approach would be "difficult to apply here" since Plaintiffs "presented no evidence of Syria's actual expenditure on terrorism."  *Id.*  They do allege that Syria spends somewhere between $500,000,000 and $700,000,000 on terrorism, but they cite no authority for that claim.  ECF 14-1 at 76.

Other courts have simply awarded $150 million for each of the victims and their families.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  But that approach is usually reserved when one of the plaintiffs was killed by the attack.  *Doe*, 2020 WL 5422844, at *17.

The third approach "is to multiply the total compensatory-damages award by a factor of between one and five."  *Doe*, 2020 WL 5422844, at *18; *see also Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C 2018).  That was the approach taken by the court in *Doe*, and it makes sense here too.  Courts choose the multiplier by weighing several "factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding of terrorist activities."  *Hamen v. Islamic Republic of Iran*, 407 F.

Supp. 3d 1, 10 (D.D.C. 2019).  In *Doe*, the court determined that the appropriate multiplier was three.  *See Doe*, 2020 WL 5422844, at *17–18; *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50–51 (D.D.C 2012).  The Court agrees with that conclusion.  Thus, since the total amount of compensatory damages is $27,232,031, applying a multiple of three results in a punitive damage award of $81,696,093.

### C.      Interest, Attorneys' Fees, and Costs

Plaintiffs also requested in their complaint prejudgment interest, an award of attorneys' fees, and reasonable costs and expenses.  *See* ECF No. 1 at 26.  In their motion for default judgment, Plaintiffs do not mention prejudgment interest, but reraise in their conclusion that they seek costs and—for the first time—mention post-judgment interest.  *See* ECF No. 14-1 at 78.  Plaintiffs are entitled to post-judgment interest but not the rest.

The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and that such interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).  The statute also says that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually."  *Id.* § 1961(b).  "Application of section 1961(a) is mandatory, not discretionary."  *Schooley*, 2019 WL 2717888, at *79.  Thus, the Court will award Plaintiffs post-judgment interest at the statutory rate.

Whether to award prejudgment interest is "within this Court's discretion, subject to equitable considerations."  *Oveissi*, 879 F. Supp. 2d at 58.  It is only appropriate for compensatory damages, but there are limits.  *Id.* at 58–59.  "When an award without prejudgment interest fully

compensates a plaintiff, an award of prejudgment interest no longer has the intended compensatory purpose and should be denied." *Doe*, 2020 WL 5422844, at *18 (cleaned up). Chaim Winternitz's economic damages were discounted to their present value. *See* ECF No. 14-4 at 10; *see Roth*, 78 F. Supp. 3d at 404 ("prejudgment interest should not be added to economic loss damages when such awards are already discounted to present value because this would result in double counting of the interest multiplier"). And the Court calculated B.W.'s pain and suffering damages to be fully compensatory. *See Doe*, 2020 WL 5422844, at *18 (declining to award prejudgment interest when the injuries "are in the nature of enduring psychology harm" and the "damage award assumes continued suffering"). Same for the other family members' solatium damage awards. *See Thuneibat*, 167 F. Supp. 3d at 54 (solatium damages "do not typically require prejudgment interest because they are designed to be fully compensatory" (cleaned up)); *see also Wyatt*, 908 F. Supp. 2d at 232 ("pain and suffering and solatium damages are both designed to be fully compensatory"). For these reasons, the Court will not award prejudgment interest.

As for Plaintiffs' request for attorneys' fees and costs, they "have not provided any information regarding the fees and costs sought," so the request is denied without prejudice. *Schooley*, 2019 WL 2717888, at * 79. The plaintiffs may file a post-judgment motion for attorneys' fees in accordance with Federal Rule of Civil Procedure 54(d)(2)(B), and for costs in accordance with Federal Rule of Civil Procedure 54(d)(1)." *Id.*

**V.      Conclusion**

For all these reasons, the Court will grant Plaintiffs' Motion for Default Judgment, ECF

No. 14, and award damages in the total amount of $108,928,124.  A separate order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 31, 2022